H. C. Corley v. State

No. 26,873. June 2, 1954
Appellant's Motion for Rehearing Granted October 20, 1954
State's Motion for Rehearing Denied
(Without Written Opinion) November 24, 1954

*Odell & Brann,* by *T. R. Odell,* Lubbock, for appellant.

*Hubert L. Watson,* Special Prosecutor, Stamford, and *Wesley Dice,* State's Attorney, Austin, for the state.

WOODLEY, Judge.

The conviction is for theft of a calf; the punishment, two years in the penitentiary.

The sufficiency of the evidence is challenged.

Appellant, who resided at Knox City, in the early morning of May 12, 1953, went to the home of Frank McAuley some fifteen miles west of Knox City, in King County, with four white-faced calves in a trailer. McAuley asked appellant where the calves were from and he said he was selling them for a boy at Stamford.

McAuley purchased two of the four calves, delivering another calf to appellant in partial exchange for one of them.

One of the calves McAuley purchased from appellant was identified as belonging to the 6666 Ranch in King County, Texas, by the following testimony.

On the afternoon of May 11, 1953, around 5 or 6 o'clock, Ned Herr, a gauger for the Humble Oil & Refining Company, who also carried the mail, saw a cow walking the fence inside the Four 6 Ranch and a calf in the Benjamin-Guthrie Highway. He returned along the same route about 7 P.M. but did not notice the cow or the calf.

The next morning he again saw the cow walking the fence, but did not see the calf.

George Humphrey, the manager of the 6666 Ranch, testified that he found one of the ranch cows "walking the fence on the Highway east of Guthrie, bawling and with a tight bag." This cow was penned on May 13, 1953, at "Dykes Creek Pen." Two other witnesses saw the cow before and after she was penned.

The calves which had been purchased from appellant by McAuley, and two others which appellant had had in his possession, were brought to these pens on the 6666 Ranch.

Manager Humphrey, after seeing these calves and the cow, testified in part:

"Q. One of your calves was missing about May 11th, 1953? A. Yes, Sir.

"Q. Did you ever regain possession of that calf? A. Yes, Sir.

"Q. After you regained possession of this calf did you put it with this cow you had penned on May 13th, 1953? A. Yes, Sir.

"Q. What kind of a calf was it? A. A Hereford calf, from a Hereford cow and Hereford bull, and it was light colored.

"Q. What color was the 6666 cow you had penned? A. Light.

"Q. State whether or not the color of the calf matched the color of the cow? A. Yes, Sir.

"Q. When this calf was placed in a pen with the cow, on *March* (May) 13th, 1953, what if anything happened? A. The cow claimed the calf."

A number of pictures of the cow and this calf were taken and were offered in evidence.

There is a great deal of testimony in the record regarding the mother instinct of range cattle and especially Hereford cows, and the actions and descriptions of the cow and calf which formed the basis of the identification of the calf by Mr. Humphrey, a part of which follows:

"Q. You don't know whether that calf belonged to that cow? A. I would say it did belong to it.

"Q. You had never seen the calf before? A. No, Sir.

. . . . . . .

"Q. You don't know whether any of those calves belonged to this particular cow? A. Yes, Sir, the cow claimed the calf; we put all of the calves in the pen and she picked this calf and let him suck and licked it and she wouldn't let the other calves suck and I have been cow buying a good long time.

"Q. Don't you know that a baby calf when it is young will suck any cow? A. The calf will or might but the cow wont let it suck if it is not her calf.

. . . . . . .

"Q. You have no other evidence that it was your calf except the calf sucked this cow? A. The evidence is that the cow was walking the fence with a tight bag and bawling and her calf wasn't to be found near where she was.

"Q. Is there any other evidence that you have other than you got a calf down there and brought it up here and it sucked that cow? A. No, Sir, that calf resembles all of our cattle.

"Q. There are other Hereford cattle than yours? A. There is a difference. I can show you Hereford cattle that don't resemble; there is as much difference in Hereford cattle as in black and white cattle.

"Q. You are not telling this jury that you know that this particular calf belonged to this particular cow? A. No, Sir; range Hereford cows don't do those things and I say that calf was hers.

"Q. The only way you know is that the calf sucked the cow? A. No, the cow claimed calf; the cow would bawl the calf would answer her and when the calf would bawl the cow would answer it and go to it.

"Q. You say the calf bawled? A. Yes, Sir, and the calf answered and went to her.

. . . . . . . .

"Q. You say you put several calves in the pen with this cow? A. Four.

"Q. Where was the other three calves from? A. The Slaughter Ranch.

"Q. What, if anything, took place between the three calves from the Slaughter Ranch? A. When this cow let this calf nurse, the other calves came up and tried to nurse and she kicked them off.

"Q. What kind of calves were they? A. Cherry red with white markings.

"Q. What color was this calf? A. Kind of a palish light red.

"Q. Did this little calf that you claim resemble the other three calves? A. No.

"Q. You say you have worked about twenty years with cattle? A. All of my life.

"Q. Are you familiar with the habits and behavior of mother cows? A. I think I am.

"Q. State whether or not one of these Hereford Range Cows will claim a calf other than her own? A. I have never seen a wild range Hereford cow take another calf, than her own, unless you put her in a pen and tied — tie her feet.

"Q. Tell the jury how this 6666 cow acted when this calf was put in the pen with her? A. She smelled around on it and the calf went up to her and went to nursing; she would let this calf nurse and when the other calves would try to nurse she would kick them off."

There was other testimony corroborative of that of the ranch manager regarding the habits and mother instinct of cows, such as the following from Sheriff Cousins of Haskell County:

"A. The cow was in a big lot and the calf was in a little lot and Mr. Humphreys opened the gate and the calf ran straight to it's mother.

"Q. Do you know of your own knowledge that it was it's mother? A. The cows knows more about it then I do. We open-

ed the gate and the calf ran toward the cow and the cow ran towards the calf and I wouldn't have wanted to be in front of her."

We find no error shown in the admission of this testimony and find the evidence sufficient to establish the identity of the calf which the 6666 cow claimed, as belonging to and missing from the ranch.

Testifying in his own behalf, appellant said that the calf identified as the 6666 calf, with three others, was brought to his home shortly before midnight on May 11th. Gerald Harris, he testified, came to his door and said a boy out there had some calves and that he wanted a horse. He went out to the car, looked at the calves and went with Harris and the boy to the Smith lot where they were unloaded. He testified that Harris made the trade and authorized him to sell the calves. He denied that he told Frank McAuley he was selling the calves for a man that lived at Stamford, or that he told George Humphrey that he paid spot cash for them.

Clyde Smith, in whose pens the four calves were placed, testified that the following morning he asked appellant where he got the calves and appellant said he "bought them off a boy last night." He accompanied appellant to McAuley's place and was present when the sale was made to him of the two calves.

Gerald Harris testified that he purchased the four calves which were taken to the Smith pens for $40 from Bill Baber, and authorized appellant to sell them for him.

Baber testified to like effect and said that the four calves he sold to Harris and which were unloaded in the Smith pens were stolen by him from the Lazy Z or Slaughter Ranch in Garza and Borden Counties where he had been an employee, for which theft he was under a suspended sentence and was being required to make restitution.

Three of the calves were claimed by Slaughter or Lazy Z Ranch cows and were identified in much the same way as Mr. Humphrey identified the 6666 calf. But the manager, Mr. John Lott, described that calf as "a calf that was definitely a light colored calf that we didn't have any like" — that "it definitely wasn't our calf" and "that was not our calf; that calf was too far off color to belong to us."

It is urged that appellant, when his possession was questioned, gave an explanation which is reasonable and its falsity was not shown by the state.

Smith testified that appellant said he bought the calves "off of a boy last night."

McAuley quoted him as saying that he was selling the calves for a man at Stamford.

George Humphrey testified that appellant told him that he bought the four calves "in front of his house from a man that he didnt know who he was, in a trailer behind a Mercury car and that he paid him $65.00 in cash for them."

The evidence shows that Baber was not from Stamford but from Andrews, and the calves he brought to Smith's pens were hauled in his car, not in a trailer. They were sold to Harris, not to appellant.

The state is not required to prove the falsity of every explanation made by the accused, but only that which he gave when his possession of the stolen property was first questioned. Ashlock v. State, 16 Texas App. 13.

The fact that conflicting explanations are given by the accused may be considered by the jury in determining whether they are reasonable and probably true. Stephen v. State, 69 Texas Cr. Rep. 437, 154 S.W. 996.

And the falsity of the explanation may be shown by circumstantial evidence and determined by the jury viewing the explanation in the light of all of the facts in evidence. Gold v. State, 81 Texas Cr. Rep. 611, 197 S.W. 1110; McKnight v. State, 70 Texas Cr. Rep. 470, 156 S.W. 1188; Andrews v. State, 25 Texas App. 339, 8 S.W. 328.

Appellant testified that Harris bought the four calves from Baber — Baber testified that he stole the four calves he delivered to Harris from the Slaughter Ranch.

Appellant testified that Harris authorized him to sell these four calves — Harris corroborated him.

Regarding the disposition of these four calves, appellant testified that on May 12th he went first to McAuley, sold him

two calves and bought one from him. This was early in the morning. Next he went to J. E. Hunter's, who was not at home, and then to J. D. Shirley's and there unloaded the calves into another trailer.

According to appellant's testimony he had three, not four calves in the trailer when he went to Hunter's place, and that when he went back to town he had three calves. As stated, Hunter testified there were four, of which he bought one after dark on the 12th. One calf was sold to Warren on the morning of the 13th and the tagged calf was re-sold to McAuley. Thus one of the calves which appellant's witness Hunter saw in appellant's possession is not accounted for. It is entirely probable that the jury may have concluded that this was the fourth calf which Baber brought to the Smith pens on the night of May 11th.

The case was submitted to the jury upon a charge of the law of circumstantial evidence and the possession of recently stolen property. The jury was told that the burden was on the state to prove beyond a reasonable doubt that appellant's explanation of his possession of the calf was unreasonable or false, otherwise they were to acquit him.

Under the facts we do not feel warranted in holding that the findings of the jury that the 6666 calf was not one of the four calves brought to Smith's pens by Baber, and that appellant's explanation that he was selling the calf for a boy in Stamford was false and not supported by the evidence.

There is another bit of testimony which should be mentioned. Travis Jones testified that appellant was in his cafe in Guthrie about 5:30 A.M. on May 11, 1953, and came back around 5 or 6 P.M. Appellant resided in Knox City.

The cow with a lost calf was seen along the Guthrie-Benjamin Highway east of Guthrie on May 11th. The calf was last seen on this highway west of the Knox City cut off. Appellant denied being in King County on that date.

We are unable to agree that the evidence is insufficient to support a finding that appellant was guilty of the original taking of the calf.

The pictures and the testimony relating to the identification of the calf were admitted over appellant's objection. We find

no error in the ruling of the court admitting this evidence as tending to establish the identity and ownership of the calf as stolen property.

Another complaint is directed to the testimony on cross-examination of the defense witness Baber. Harris, also a witness for the defendant, testified that he purchased the four calves from Baber; and by other defense witnesses it was shown that Baber came to Rochester, where Harris resided, with the calves and that he was inquiring for Harris. Harris, however, denied that he saw Baber on May 10th or that Baber told him that he could get some Slaughter calves. Also he denied that he made a deal with Baber on May 10th to give him $12.50 for every calf he would bring, or agreed to pay $15 a head for the next load Baber delivered to him from the Slaughter Ranch.

Baber was thereafter called and, having corroborated appellant and Harris as to the delivery of the four calves, was asked on cross-examination and permitted to testify that he did see and have such conversation with Harris on May 10th, at which time he informed Harris that he would bring 3 or 4 calves on Tuesday night.

Under the facts here, the calves having been shown by the defense to have been delivered by Baber to Harris and appellant at the Smith pens, no error is shown in the admission of this cross-examination of the witness Baber.

Finding no reversible error, the judgment is affirmed.

### ON MOTION FOR REHEARING

MORRISON, Judge.

In our original opinion we did not discuss Appellant's Bill of Exception No. 25.

The witness Baber testified for the appellant that he had sold the calves to Harris and that appellant had been present when the calves were unloaded. This was the extent of his direct examination. On cross-examination the state elicited from the witness the fact that he had had a prior arrangement with Harris to steal the calves from the Slaughter ranch where he worked and bring them to him. He was then asked if he had not, in answer to appellant's question, told him where he had gotten the calves. He replied that he had not. He was then asked if he

had not told Humphreys, Hollar and the special prosecutor that he had informed the appellant that the calves had come from the Slaughter ranch. This he denied. He was then asked if he had not told the same parties that the appellant had offered to bribe him to let him (the appellant) drive through the Slaughter ranch. This he denied. It should be noted here that the only possible implication from these last questions was that the appellant knew the calves were stolen and wanted to steal some more cattle himself. Surely the state had the right to prove this fact if they could from the witness Baber or from any other source consistent with the rules of evidence. But let us proceed to determine how they did prove it in this case.

The witness Humphreys was called in rebuttal and, over the appellant's objection, permitted to testify that he and Hollar and the special prosecutor had talked to the witness Baber before the instant trial and that Baber had told them that he had informed the appellant that the calves had come from the Slaughter ranch and that appellant had offered him $50.00 to let him (the appellant) drive through the Slaughter ranch.

This manner of proof would appear to be in violation of the rule so concisely stated by Judge Lattimore in Austin v. State, 95 Texas Cr. Rep. 417, 254 S.W. 795, as follows, " . . . if the State seeks to draw out new matter from a defense witness on cross-examination, and fails to elicit the desired answer, it is error to allow the State to impeach such witness by proof of the desired facts by other witnesses, *and thus get hearsay evidence before the jury.*"

In Wells v. State, 43 Texas Cr. Rep. 451, 67 S.W. 1020, the witness Pafford testified that he had seen one Cummins in the absence of the accused and that Cummins had reported to him that the appellant had told him (Cummins) that he was going to commit the offense. Both the appellant and his witness Cummins denied that the statement had been made. In reversing the conviction, this court said, "If Cummins was placed on the stand to prove the statement as having been made by the appellant, and denied it, Cummins could not then be impeached by showing that he (Cummins) had told Pafford that defendant had made the statement."

In Casey v. State, 49 Texas Cr. Rep. 174, 90 S.W. 1018, the appellant offered the witness Laura Casey, who was cross-examined about certain statements she was alleged to have made to others about matters not brought out on direct examination.

Laura denied having made such statements. This court held that this was failure of proof and that it was error to permit other witnesses to testify that Laura had made the statements to them.

In Mitchell v. State, 84 Texas Cr. Rep. 36, 204 S.W. 767, this court, in considering this type of evidence, said, "It was not Mrs. Mitchell testifying, or any other witness testifying, to what defendant said, but it was Mrs. Kemper testifying to what Mrs. Mitchell said the defendant said, which was denied by Mrs. Mitchell."

We quote from Lewis v. State, 108 Texas Cr. Rep. 258, 1 S.W. 2d 298:

"The bill shows that Ted Jones, a witness for appellant, had testified to material facts bearing on the issue of self-defense; that upon cross-examination of said witness by the state he was asked if he had not told Officer Timmons that appellant told him (Jones) that he (appellant) was going to kill him a negro by Christmas; that the witness Jones denied making such statement to Timmons; and that Timmons was then placed upon the stand by the state and testified that Jones made the statement to him. As shown by the bill, appellant was not present at the time Timmons had the conversation with Jones. Moreover, the bill shows that the matter had not been gone into by appellant. In our original opinion we discussed the matter complained of in this bill in the light of appellant's objection that the testimony was improper, in that it was an effort on the part of the state to impeach the witness on an immaterial and collateral matter. We note now that the bill shows that appellant also objected to the testimony on the ground that it was hearsay. This objection was well taken. The testimony was hearsay, and was inadmissible even for the purpose of impeaching the witness. See Mitchell v. State, 84 Texas Cr. R. 36, 204 S.W. 767. It is obvious that the facts elicited from the witness Timmons, under the guise of impeaching the witness Jones, were calculated to prejudice appellant."

It cannot be said that this evidence was admissible, even though hearsay, in order to impeach Baber because the issue in the instant trial was not whether Baber or the officers were telling the truth but rather whether the appellant had acquired the calf involved in this prosecution feloniously.

The danger of permitting such evidence is apparent and calls for a reversal of this conviction. Accordingly, the motion for rehearing is granted; the judgment of affirmance is set aside; and the judgment is now reversed and the cause remanded.